Good morning, ladies and gentlemen. Judge Rogner, for family reasons, cannot be present in person, but he's present by video link and will be participating, so I guess counsel should take a look at the monitor in front of them. Our first case this morning is the Bank of Commerce v. Hoffman. Mr. Peckin. Thank you, Your Honor. May it please the Court, Honorable Judges, I'm here on behalf of Defendant Kenneth Hoffman. My name is Jerry Pepping. First question that I raise is, is it possible for parties, when tendering a deed in lieu of foreclosure, to obtain a release of more debts than those pertaining to the property? I submit the answer is clearly yes. In Illinois, parties are free to contract and enter into releases and settlements. If we were just looking at a deed in lieu of foreclosure that only involved the property debts itself, we wouldn't even need to have a release agreement. The Illinois Foreclosure Act directly provides for the effect of a deed in lieu of foreclosure. So the real question in this case becomes, did the parties agree to release more than just the debts covered by the loan documents pertaining to these three properties? The first step in that process is to analyze the document within the four corners. This Court in Burke v. Dun & Bradstreet said that if only one interpretation makes sense, the case is over. Also that if one interpretation is reasonable, another is not, then go with the reasonable interpretation. Now, forgive me, Mr. Pepping, this is Judge Rovner. Hello. Yes, Your Honor. Given the relative size of Mr. Hoffman's obligations on that TIF note and the Fry Lake Venture Guarantee, wouldn't one expect the agreement to mention those other liabilities expressly if the parties had agreed to release Mr. Hoffman from those obligations? Well, because the agreement was worded that it included but was not limited to those and were not related to these three properties, it wasn't necessary to list all the specific debts involved. But the real fact of those other debts is he was one of many parties that were liable on those debts. So I'm interested in my colleague's question, too. I wish you'd answer it. Okay. So it could have listed those debts, but... The question is, wouldn't one expect normal commercial contracting parties to do that? I think most of the time when you're doing a release agreement, you want to have that release worded to cover all debts and liabilities. So you would indeed mention them? Well, you could, but if you tried to mention everything, you might leave something out. There could be other debts. But I think most releases that you find settle all claims, whether known or unknown, whether or not related to any consideration that's being delivered from the other side. The TIF bond that you mentioned, is that a general obligation bond of some kind? Yeah, it basically is a bond, I think, that secures real estate that's covered by a TIF agreement. Well, he apparently, in effect, loaned money, right? Isn't that what you get back in return for a bond? I'm not sure. I don't think he personally did. I think it was part of a... Well, they're using it as security. That's why I wondered. What's the value of that TIF bond? I think the value of the TIF bond would be the TIF payments that come out of the TIF fund. Well, you know, a bond, I don't understand. Normally when you get some kind of industrial revenue bond or any kind of a bond, you, in effect, give money, and in return you get that bond. And apparently that bond is worth something. I would think so. It's sort of receivable for him, and that's why it was put up as security, I guess. Well, I don't think it was his personally, though. It wasn't? No, I think this was part of this Fire Lake development. So these other two loans that these cases are involved... So he wasn't the only one obligated? That he was guaranteeing, basically. So he just had a share of that, not a whole lot? Right. Okay. That's enough. I just wasn't clear. So I submit to you, when you try to come up with the most reasonable interpretation, give terms that are plain, ordinary meaning, like this court said in the Burke case, that there is no possible way to review this release and rule in favor of the plaintiff unless you change words and give them the opposite meaning. But when you look at it from our perspective, there is no statement that's inconsistent with getting a release of all liens. So there's no place... Well, don't the recitals, even if they're not terms of the agreement, show what the party's meant to resolve? And the recitals, as the Supreme Court of Illinois said in the Polo... Or not the Supreme Court, Second District said in the Polo National Bank v. Lester, generally don't show the full consideration of what's involved. And even under the Four Corners Rule, you should look beyond that to see what the full consideration is. But the recitals kind of show what led the parties to get to that point. And the first several recitals talk about the debts that are involved in the deed in lieu of foreclosure, and then there is the general language at the end of the last recital at the bottom of page two of the agreement that indicates that it's in satisfaction and full of any and all claims FDIC receiver has or may assert against the release party. So the recitals are part of the agreement, you're looking at it as a whole, but if you're looking at the recitals to see what the true promises are, I would submit you're looking in the wrong place. And the key paragraphs, I think, in this agreement are the actual promises and covenants themselves. In paragraph one... Well, wouldn't you agree that what you've got here is unlimited boilerplate release language? I would say it's unlimited. It's very broad because that's what was intended. I mean, it's not just broad language that says all claims, but it says including but not limited to those relating to these properties. And whether they arise out of or are connected with the loan documents or whether they are connected with the properties or not. So there was care taken in drafting that document to cover what the parties intended. And I don't think there's any law that I'm aware of that... Would you agree that this would really be a windfall for Mr. Hoffman to construe the other liabilities? No, I don't think it would be a windfall. I think this is a case where those other liabilities were one that many parties were on. And in considering whether to give Mr. Hoffman a release or not, the FDIC should have considered what his net worth was and what all the other parties' net worth was. And this was a way of buying peace and getting this taken care of. It wouldn't release him and not everybody else, obviously. So that couldn't be. Everybody else would say, wait a minute, why are you releasing him and not us? And that's not going to work. Well, because he gave these other three properties back. Well, yeah, but he gave them back. But the language there clearly shows the intention. And we should give words that are plain and ordinary meaning. I don't think we should reexamine the bargain and say they didn't negotiate a very good deal. It's too good for Mr. Hoffman, so we're not going to enforce the agreement and give it the meaning that it really says. And the fact that someone calls it boilerplate, I don't know of any law that says that words shouldn't be ignored and lawyers can subjectively say what they intended to say and disregard something and call it boilerplate. So I don't think that that's a very strong argument that the other side has made, that this is boilerplate. In the Farm Credit Bank of St. Louis v. Whitlock case, the Supreme Court in Illinois said that when parties are aware of an additional claim at the time they sign a release, the general release language will be given its full effect. Now, in that case, the language in the document said that the particular loan was the sole inducement for the conveyance. It had limiting language in it. Not only is our case different, it says it is not limited in several places, and it's not just the general language. It says it includes other debts. In the Polo v. Lester case I cited, the court said that you can look beyond the terms of the recitals. And then this court in Atlantic Mutual v. Metron said it's presumed that every clause in a contract was inserted deliberately and for a purpose. That's a Seventh Circuit decision. I don't know how you can rule in favor of the plaintiff because you'd have to say, oh, this was just an accident that this wording got in here. But that's not the presumption. Now, Mr. Peffing, Mr. Hoffman admitted, did he not,  he understood the agreement was only to resolve his debt on the $157,300 loan, not the $1.5 million and the $900,000 on top of that? That was one of the questions that he answered with an incorrect legal conclusion, and he clarified that just seconds later when asked questions. But the question is, what does the agreement do? And the agreement speaks for itself. But what is clear in terms of the facts, the objective facts, not the subjective view of what the agreement does, the objective facts are that Hoffman did tell Erica Covey that he wanted to exclude all debts, not just the ones relating to these three loans. And that is uncontradicted testimony. And after that was done, the document was drafted. And even if Erica Covey couldn't remember anything when she was being deposed, she said, I don't remember, 29 times, certainly at the time that she talked to Mr. Richards and asked him to draft it, she would have had fresh in her mind what Mr. Hoffman said to her. And then if the FDIC did not want to have that released, why would they put language in the document saying that the release includes but is not limited to these loans, and it covers all debts even if they're not related to these properties or the loans? So I think the key language in determining what was intended to be released is what Paragraph 2 says, which is entitled Release. That's the actual promise. The only consideration for that was the deed in lieu of foreclosure on three properties, and that's it. That's it, yeah. And so he's going to get all that other benefit just for that consideration, which may be even being less than $150,000. That is the deal he bargained for and signed in writing. That's what you think. Yeah. I mean, there are limits obviously relating to his net worth and what they could collect, and he didn't even want to go down that road. He wanted to get this resolved and buy peace. He asked for it, and he got an agreement that was consistent with what he had asked for. Thanks, Scott. Any further questions? Not at the moment. Thank you. Ms. Tanner. Good morning, Your Honor. May it please the Court, my name is Jacqueline Tanner, and I'm with the FDIC Appellate Unit. With me at council table is Kathy Sons. She represents the Bank of Commerce, and she will answer any questions the Court might have, specifically with regard to the $900,000 guarantee claim. Ms. Tanner, could you start out and help me with this? Was the FDIC lawyer, Mr. Richards, aware of Mr. Hoffman's other liabilities when he inserted the release language into the agreement? Your Honor, the record is unclear on that, but it's my understanding that he was not aware of the other debt. He was asked to prepare the settlement agreement for this particular deed-in-lieu transaction, but certainly the FDIC was aware of the other debts. Would you agree it was somewhat negligent not to narrow the release terms to make clear that the release was only addressing the one loan? Well, I think Mr. Richards himself admits that it could have been drafted more tightly, but the key legal point here is that in Illinois, the broad release language, the boilerplate language, that was inserted can be overridden if it's in conflict with specific references in the agreement to a particular debt, and that's happened over and over again in Illinois, although Mr. Pepping fails to even attempt to reconcile the case law that we cited throughout our brief in which courts in Illinois have held that specific references limit, including the recitals, limit the breadth and scope of a general release. Starting, I guess, with the Illinois Supreme Court, it's true that that case is really on all fours with this one. There were two loans involved in that case. They were arguably way more related than the loans that he's seeking relief from are to the small $157,000 note, but the court nevertheless found that general language, release language, which was the same as the language here. It said particularly, but without limiting the generality of the foregoing, the foregoing being the specific loan mentioned in the settlement agreement, that created an ambiguity because the agreement addressed only, in that case, loan number two. Here there's no relationship. They're totally separate obligations. The district court properly applied contract construction principles in Illinois that give a kind of enhanced special scrutiny to releases that include both general release language and specific references to a particular loan. Isn't this, I want to use boilerplate, but if there's just one loan, oftentimes a mortgage will have 14 paragraphs. When you get down to about the 13th or 14th paragraph, it says, and this secures delinquent credit cards and all sorts of other things. Most people don't read that far, but that's what mortgages say. I can understand where that one type of loan, the boilerplate, might include all that so that they can't go collecting un-credit cards or something else that comes up other than the loan, the mortgage itself. Your Honor, paragraph two serves another purpose. If you read it, it expands the definition of released party to include Mr. Hoffman's insurers, attorneys, successors, heirs, et cetera. But it was all intended to be with respect to these particular properties. That's the conclusion of the district court based on her examination of the extrinsic evidence and the document itself. So it does serve a purpose. It's not going to be read out of the agreement entirely under the district court's interpretation. The case law is just consistent that the courts will look at general release language not in isolation, but in the context of the entire agreement and in the context of the surrounding circumstances. And here, as Judge Rovner pointed out, Mr. Hoffman himself admits that when he went in to the negotiations, it was solely with respect to the small loan that he had jointly with his wife on the $157,000. He admits to mentioning his other debts to Ms. Covey, who was the FDIC servicer. She squarely, firmly testified that she did not mean to be negotiating any other debt with this deed-in-lieu transaction other than the $157,300. Was she the loan officer that loaned money for those three parcels? She was the FDIC's. She serviced the loan for the FDIC after the FDIC took over the failed bank. She took over the file. All of the correspondence concerning the back-and-forth between Mr. Hoffman and Ms. Covey all specifically referred to one loan, the $157,300. And Ms. Covey testified that she had to get the FDIC's permission, approval for the settlement, and that she only asked for approval of the $157,300. She did not present the other loans to the FDIC. Is there any document that represents that? Her testimony and deposition, Your Honor. That's it? Yes. And so the district court was really required under Illinois law, including the Supreme Court's decision in farm credit, the Countryman decision, which, by the way, involved claims known to the parties when they entered into a settlement agreement of some of the workman's comp claims, but not all. The court held that broad language in the settlement agreement did not foreclose a later suit by the employee on a different injury. Just case after case settles that question in Illinois. The Atlantic Mutual case actually is not a release case. I don't think that the law is clear. The district court applied it correctly. The facts show that the parties did not contemplate the settlement of these large debts that Mr. Hoffman owed individually, not with his wife. They were separate debts. And there's no basis for reversing the district court's really careful, thought-out opinion. If there are no further questions, I'll... Thank you, counsel. Thank you. Ms. Sonks. Good morning. May it please the court, honorable judges, my name is Kathy Sonks. I represent both FDIC and Bank of Commerce, but I'm arguing this morning on behalf of Bank of Commerce. I would like to answer a couple questions more specifically. The question was asked whether the attorney who drafted this was aware of the other. Counsel said the record was ambiguous. He actually did testify very clearly that he was not aware of this. Ms. Covey, who was the servicer for the loan for the FDIC, was aware of it, but the attorney who drafted it was not. The attorney for whom? The attorney for the FDIC. Okay. The other question I'd like to address, I believe, was... That was the primary question. This case is about contract interpretation, specifically with lease interpretation. The question is twofold. Was there an ambiguity? I think Farm Credit and Countrymen v. Industrial Commission very clearly established that there was an ambiguity when there are specific provisions and general provisions, and this general provision was actually very broad. Many of the cases that counsel for Mr. Hoffman cites have to do with where it is a specific incident, and the language may be broad with respect to that particular incident, but not to the extent where this is all-encompassing. The Paragraph 1, which has to do with the tender of deeds, that limits it, as well as the recitals, but that specifically talks about release and limits it to arising out of these properties in this loan document. When you get to Paragraph 2, which is very broad, it basically releases everything, everywhere from the beginning of time to the end of time with respect to everything. If you take it to its extreme and read it, it releases everything from if someone who was a secretary for the FDIC and was involved in some sort of car accident and somebody at the bank was also involved or something, it would release something of that nature if you read it to its extreme with all of this. That clearly was not the intent here. The intent here was to limit it to these particular properties. It's very specific in the recitals. It goes through a lot of detail in the recitals. If there was an intent to include this $2.4 million in these two other items, certainly those would have been included in there. It's not logical to read this or reasonable to read it as including all of these other or these two other very major and very significant loans when they go through in so much detail as to these. If, in fact, there were some recitals that detail some of these or no recitals that talk about this, maybe one could read that broad language to include this, but that's not what we have here. What we have here is a very specific enumeration of the loan documents, the document numbers, even the recording of the mortgages. It talks about what the recorded document numbers are and goes through all of those specifics. I cannot believe that one could construe this broadly to include two other loans that are multiple, multiple times this particular thing without that being mentioned somewhere in the loan. That's true not only from FDIC's perspective and now Bank of Commerce. It's true from the perspective of Mr. Hoffman that he knew all this stuff was out here, and he sees that it's very specifically talks only about this. He was told that it wasn't within Ms. Covey's power to consider these other things. He had asked that he wanted a broad thing, and he understood that she wasn't necessarily at liberty to make that decision. He gets the release. It has all of these very specifics enumerated and does nothing then to include that. Looking at the mortgage itself, were there three mortgages on those three properties? There was one loan but three separate mortgages on three distinct lots, the total sum of which, the three of them, was the $157,300. Did those mortgages have what I referred to earlier as sort of a catch-all, said that this secures credit cards and all sorts of other things? I do not actually know that. Okay. I'd be curious to know that just because that's why they might want to say, oh, that is released too, whatever was in the mortgage. And a lot of times mortgages have a lot of stuff that people don't even look at. Correct. Does Your Honor have any other questions? Doesn't look like it. No. Thank you very much, Ms. Soames. Thank you. Anything further, Mr. Pepping? Yes, Your Honor. I have just a few points in rebuttal. First of all, in talking about the farm credit case, the Illinois Supreme Court case, that case didn't say, like this one, that it was including but not limited to. In fact, that case said that loan number one was the sole inducement for the release. So it is a different case. Secondly, in terms of the discussions between Mr. Hoffman and Erica Covey, she did not say that she had nothing to do with those other loans, the Fire Lake loans. She told Mr. Hoffman she wasn't the decision maker and she would have to check with others to see if those other debts could be released. But she was assigned those files as well and admitted that, the files relating to the two loans in the cases in question, not just the three involving the deed-in-lieu properties. Why would somebody do this? Why would Mr. Hoffman not be willing to just do a deed-in-lieu? Well, if he's going to have to file bankruptcy, why spend the time entering into a settlement or hiring an attorney or deeding back properties? I mean, the loans in these two cases are enough to wipe him out. So if he's going to do a settlement, he wants to not have to file a bankruptcy and get release from all of his debts, including these other ones that were in default. So it makes a lot of sense that he would be seeking that. Did you happen to see the mortgages? I saw the mortgages when we went through the release. Yeah, well, I'm just wondering if those mortgages included a catch-all phrase or paragraph in there that it secures credit cards and any other thing. No. It was not in there? No. The mortgage specifically referred, all three specifically referred to the note, the 150. Well, yeah, they do that for sure. But there's a, well, it's been a long time since I've worked with mortgages, but there's usually a pretty long document. Oh, they are. And then you get down toward the end, you get into that little stuff, which may make more logical why to have that last paragraph in there, because it was focused on what was in the mortgage obligation in the first place. Yeah. And I'm sure these are part of the record, so I can say these mortgages weren't cross-collateralizing other debts like the ones relating to the Fire Lake loans. No, not cross. I'm referring to in case you have a credit card at the bank. Oh, yeah, no. It's sort of a blind release of something that wasn't anticipated in the first place. Yeah, yeah. But it may have accumulated during or whatever, and that's seldom enforced, I might add. Yeah, I'm certainly not aware of that. No. I think in this case the biggest question is do we even get to the depositions, do we get to the parole testimony, is there a way to construe this document on its face to mean any one thing? And I submit, yes, it is. It is consistent with a deed-in-lieu situation where a global release was given. Now, you can question whether that was a good deal or not, and I think if you get into the parole evidence and find there to be an ambiguity, I don't think there is. But if you did, I think the parole evidence also favors us when you look at the actual testimony of who remembered what and when you look at the actual facts, not conclusions, not subjective positions, the actual facts. Given that everybody knew of this, the only reason they would have this broad general language in the key paragraph, the release paragraph, is if they intended to do what they said they were doing. Thank you very much. Thank you, Counsel. The case is taken under advisement.